Roach *vs.* Trottie.

---

E. J. ROACH, plaintiff in error, *vs.* J. P. TROTTIE, defendant in error.

1. Where a declaration charged that the defendant had, with force and arms and violence, broken the plaintiff's close, and with his feet and one hundred head of cattle, trampled upon and damaged his crop, and the proof showed that defendant was the plaintiff's landlord, that he had undertaken to repair the fence around the close, and in so doing had negligently taken down the fence and exposed the crop to the in-

gress of cattle ; and there was some evidence going to show that plaintiff had consented to the defendant's going upon the land and making the repairs :

*Held,* There being no count in the declaration for damages from the negligence of the defendant, but only for the trespass with force and arms, that it was error in the Court to charge the jury, that if the defendant tore down the plaintiff's fence, and cattle got in and destroyed the crop, the defendant was liable for the damages.

2. The effect of the charge was to exclude from the jury the evidence of the plaintiff's consent to the repairs of the fence. If such consent was in fact given, then the defendant was only liable for negligence in repairing the fence, whereas the charge of the Court makes him liable, if he tore down the fence and damage resulted.

Trespass. Landlord and tenant. Pleading. Evidence. Before Judge Hopkins. Fulton Superior Court. October Term, 1872.

Trottie brought trespass against Roach for $700 00 damages. The declaration alleges that the defendant, on the 15th day of September, 1870, by his agent, James Lawshe, with force and arms, broke and entered the plaintiff's close, containing nine acres, and with his feet and a large number of cattle, tramped upon and damaged the plaintiff's cotton, of the value of $700 00.

The defendant pleaded not guilty. The following evidence was introduced :

J. P. Trottie, the plaintiff, testified as follows : " I am the plaintiff. I rented from the defendant, as trustee for Mrs. Lawshe and children, the tract of land described in the declaration, for the year 1871. I planted thereon a crop of cotton, and used in planting it $80 00 worth of guano. About the latter part of August, in that year, James Lawshe tore down a portion of the fence around said cotton patch, for the purpose of building a new one, and left it down for two or three days, so that a large number of cattle came in and entirely destroyed my crop, which was just then opening. I only got two hundred pounds of seed cotton out of the whole field. Seed cotton makes about one-third its weight in lint cotton. I sold some cotton that year at eighteen and a half

cents a pound. The highest price cotton brought that year was twenty cents per pound. It was worth three cents a pound to have picked and ginned the cotton, as it stood in the field, and get it ready for market. It was a good field of cotton, averaged about waist high. It would have made six bales of cotton, averaging four hundred and fifty or five hundred pounds each. No cattle had got in the field before Jim Lawshe tore down the fence, to my knowledge. The fence was a tolerably good one. I never requested defendant, or any one else, to repair it or put a new one there. The defendant told me, after the destruction of my cotton, that he told Jim Lawshe to tear down the old fence, ten panels at a time, and put up the new one as fast as the old one was torn down. He said that he told him not to tear down more than he could put up the same day, so as not to let cattle in."

Plaintiff closed.

The defendant testified as follows: "I never gave Jim Lawshe any direction or authority whatever to interfere with the fence around plaintiff's cotton patch. Mr. Benson told me the cows were breaking in the cotton patch, and asked me to have the fence fixed. Upon which application being made, I employed Judge Hammond to make application to the Superior Court for $200 00 of the trust estate, to be applied to the fixing of the fence. I received the money and gave it to Mrs. Lawshe, and told her to have the fence fixed, and not to allow, in the repairs, but one panel of fence to be taken down at a time, so that it could be rebuilt as fast as it was taken down. I am trustee of the estate of Mrs. Lawshe, and guardian of the minor children. Early in the year 1871, Mr. Benson came to me to rent the field. I told him he could have it for $90 00. Afterwards plaintiff came to me to rent it, and I told him if he and Benson would fix the notes all right they could have it. They gave me their notes for $30 00 each, signed by them jointly and severally, and I supposed they rented the property jointly. I made the application for the money to fix the fence, at the request of Benson and for his benefit, who

had, according to my understanding, a joint interest in the crop, and for no other purpose."

James Lawshe testified as follows : " Was never instructed by defendant to do anything to the fence whatever at any time ; the cattle were getting in the field and destroying the fruit trees as well as the cotton patch, and before defendant had got the money to have the fence repaired, he had bought some lumber at his own expense, and was going to work to repair the fence, but about a week before he commenced repairs he was in the field with plaintiff, under the shade of a willow tree, where he told plaintiff of his intention to make the repairs. Plaintiff told him to do so by all means, and proffered to loan him a mule and cart to haul the posts and lumber around. About a week afterwards he (witness) sent a negro man, by the name of Green Donald, to the plaintiff for the cart and mule. He got them, and hauled the lumber round. He tore down a considerable quantity of fence at the time, and cattle got through into the cotton patch, twenty or thirty head, two or three times ; the fence was down as much as three days at one time, but they were breaking in all around the field, and had been in more or less all the summer ; had got through the water gap, which was washed out several times, and they got in through the fence, which was old and rotten, was made of boards and easily broken down. The cotton was very poor and the grass was about as high as the cotton. The cotton, if it had been protected entirely, would not have made more than a bale and a half. Plaintiff's brother, Frank Trottie, told him to have the fence fixed, as the cattle were breaking in and damaging the crop of cotton.

John Steward testified that he lived close by and saw the cattle in the field and helped to drive them out once, before Jim Lawshe commenced to build the fence ; that they were in several times before ; but the time he helped to drive them out they got through the fence where the hogs had rooted off three or four palings. That the water gap washed out two or three times, and the cattle got through that ; that it washed

out almost every time it rained much; that the crop was poor and the grass was about as high as the cotton.

Willie Lawshe testified that the cattle broke into the field all summer, and that he helped frequently to drive them out; that the water gap washed out every time there came a big rain, and cattle frequently got through it into the field; that the crop was a poor one, and the grass was as high as the cotton; that the fence was an old one, made of palings, and the cattle broke through it frequently; that he helped to drive them out.

Green Donald, a colored man, testified that he was employed by James Lawshe to help build the fence, and that he sent him to Mr. Trottie for a mule and cart to haul lumber and posts, and when he went to him, Mr. Frank Trottie, plaintiff's brother, accompanied witness and went into the house of Mr. Benson, and came out again and told him he could get them. He helped him harness up the mule and cart, and witness carried them over to Mrs. Lawshe's and hauled the lumber and posts round the field; that he helped drive the cattle out of the field once, before James Lawshe commenced working on the fence; that they got in that time by breaking through the fence; that the crop of cotton was poor, that the grass was about as high as the cotton; that the cotton growing was about knee high on the upland, and waist high in the bottom. That Jim Lawshe had finished one line of the fence when he came to help him.

Plaintiff, reintroduced, testified that he never had any conversation with Jim Lawshe under the willow tree, and never authorized him to build the fence; that the crop was a good one, and had been well cultivated, and would have made five or six bales of cotton.

C. F. Benson testified that the plaintiff was his wife's brother; that he did sign the notes given to defendant, but that he only signed them as security for the plaintiff; that he had no interest whatever in the crop, except that he expected to receive a share of the profits, if it turned out well, as a compensation for standing security for plaintiff; that he did

let Jim Lawshe have a horse and wagon to haul posts to build the fence referred to; that he does not recollect ever telling defendant to have the fence repaired, but that he did lend the wagon for that purpose; that the crop was a moderately good one, and would have made a bale to two acres; that the old fence was in rather bad condition, but he thinks it would have protected the plaintiff's crop until it could have been gathered. Defendant told him that he authorized Jim Lawshe to tear down the old fence, ten panels at a time, and replace it with a new one.

Frank B. Trottie testified that he was plaintiff's brother; that the crop of cotton was an extraordinarily good one; that the grass was not as high as the cotton; that in the bottom the cotton was as high as his waist, and in the upland nearly as high; that he never told Jim Lawshe to go ahead and fix up the fence, and that he would hire a hand to help him; that he never had any conversation with Jim Lawshe about fixing up the fence.

Mrs. Phillips testified that she lived in two hundred yards of the Lawshe garden during the summer of 1871; that if any cows got in said garden before Jim Lawshe tore down the fence, she did not know it; that the crop was not injured until after the fence was torn down; that she considered it a very good field of cotton; that she was through it only once during the summer, and there was some grass in it, but not much.

Plaintiff then closed. The Court charged the jury as follows: "If you should find from the testimony that defendant rented the land mentioned in the declaration to the plaintiff, for the purpose of making a crop, and plaintiff took possession of it and planted the crop, and that defendant, during plaintiff's term of renting, tore down the fence, or a part of it that enclosed the crop, and let cattle in upon it, and they injured it, plaintiff could recover to the extent of the injury to the crop shown by the proof. If the fence was torn down by defendant's agent, and by his command or with his assent, and by reason thereof the stock got in and destroyed the crop,

Roach *vs.* Trottie.

or any part thereof, he would be liable to the extent of the damage. If done by his agent, but not by his command or with his assent, he would not be liable."

The jury returned a verdict for the plaintiff for $382 50. The defendant moved for a new trial on the following ground: Because the Court erred in charging the jury that "if the fence was torn down by defendant's agent, and by his command or with his assent, and by reason thereof, the stock got in and destroyed the crop, or any part thereof, he would be liable to the extent of the damage."

The motion was overruled, and the defendant excepted.

D. F. & W. R. Hammond, for plaintiff in error.

J. T. Pendleton; T. P. Westmoreland, for defendant.

McCay, Judge.

1. Whilst we should be very slow to apply to an action of trespass those nice distinctions between trespass *vi et armis*, and trespass on the case, which the English writers maintain, yet our statute, Revised Code, section 3256, requires the plaintiff, "plainly and distinctly to set forth his charge or demand." It requires a considerable stretch to say that this declaration, charging that the defendant by force, broke into plaintiff's close, and with his feet and one hundred cattle, trampled his crop, (with the actual facts as they appear,) distinctly sets forth the plaintiff's charge. Only in one view of it does the writ, even by such a stretch, do this. If defendant, without any permission or consent of the plaintiff, did this by himself or servant, having thus committed a trespass by interfering with the fence at all, he is liable as a trespasser for all the consequences.

2. But if he entered by consent of the plaintiff, to repair the fence, he is only liable if he repaired it negligently. The Judge, in his charge, wholly ignored the evidence of Lawshe, that the plaintiff consented, and furnished the horse, as well as the evidence of Benson, going to show that he was jointly

interested, and that he consented. And the fact of the joint note is itself some evidence of Benson's interest. The jury were told that if Lawshe, as the agent of defendant, by his command or assent, took down the fence and the cattle got in, the defendant was liable. This made the defendant liable, even if plaintiff consented, and even if there was no negligence. We doubt (if there was consent) whether the plaintiff could recover at all, under the charges of the declaration, unless the negligence was of the grossest character, such as in cases of injuries to a person, would make criminal negligence. We think there ought to be a new trial, because the Judge, in his charge, entirely ignored the evidence going to show that plaintiff consented to the entry of Lawshe, and to the repair of the fence; because, if he did this, the defendant would only be liable, if, in doing this, Lawshe was negligent, and damage came from that negligence.

Judgment reversed.